STATE of South Dakota, Plaintiff
and Respondent,

v.

Steven Alexander KASEMAN,
Defendant and Appellant.

No. 12282.

Supreme Court of South Dakota.

Argued Sept. 19, 1978.
Decided Dec. 22, 1978.

Marc Tobias, Asst. Atty. Gen., Pierre, for plaintiff and respondent; William J. Janklow, Atty. Gen. and Harry W. Christianson, and Thomas Welk, Asst. Attys. Gen., Pierre, on brief.

Richard Hurd, Sioux Falls, for defendant and appellant; Thomas P. Tonner and John L. Maynes of Maynes, Tonner, Maynes & Tobin, Aberdeen, on brief.

DUNN, Justice.

This is an appeal from a conviction of kidnapping in the Third Judicial Circuit. Defendant was found guilty by a jury on May 15, 1977, and was sentenced to a term of life in the state penitentiary. We affirm.

On October 6, 1976, Mrs. Mary Tschirley, a 78-year-old Roscoe, South Dakota woman, visited her daughter in Aberdeen, and that evening she had a telephone conversation

with Ralph Pressler who rented her farm-land and was in touch with her by telephone almost daily. This was the last day that Mrs. Tschirley was seen or heard from. Pressler, Roscoe policeman Lechner, and a neighbor testified that on October 7, 1976, they saw a maroon automobile with a square back end parked in Mrs. Tschirley's driveway sometime after the lunch hour but before 2:30 p. m. The policeman testified that the automobile had out-of-state license plates which were white with blue on the top. The neighbor testified that she observed a large individual with dark shoulder-length hair come out of the house and go to Mrs. Tschirley's mailbox; that she later observed the maroon automobile pull out of the driveway; that the driver of the automobile had dark shoulder-length hair; and that the passenger in the front seat was Mrs. Tschirley. The neighbor stated that she knew it was Mrs. Tschirley because she noticed her gray hair and she was kind of slumped down a little bit in the front seat. Defendant's car was shown to be a maroon 1966 Chrysler Newport having a square back end with white and blue Colorado license plates.

On October 12, 1976, Pressler entered Mrs. Tschirley's residence in Roscoe with the cleaning lady and another individual. The door was open, the kitchen light was on, a burner on the stove and the oven were on, all the food on the stove and in the oven was "burned to a crisp," and Mrs. Tschirley's purse was in the bedroom. Her automobile was parked in the garage and water was running from a hose in the yard. A search of the house revealed nothing more. Mrs. Tschirley remained missing until October 23, 1976, when her body was found by a group of hunters some 15 miles east of Ellendale, North Dakota, about one-half mile north of the South Dakota border.

On the 7th of October, between 10:30 a. m. and 12 noon, defendant stopped at an Aberdeen gun shop to pay for and to pick up a Model 66 RG .22 caliber, single-action pistol that he had selected on the 5th of October.[1] Also, on October 7, 1976, at approximately 12:35 p. m., defendant picked up his automobile at an Aberdeen garage where the transmission was overhauled, the water pump replaced and the right front wheel bearings fixed. An attendant at an Aberdeen gasoline station testified that defendant was there between 12:30 and 1 p. m. to have his automobile filled with gasoline. The attendant stated that defendant acted kind of nervous, looked around a lot, and seemed to be in a hurry.

Later on the afternoon of October 7th at 4:38 p. m., defendant placed a collect phone call to his prospective employer in East Grand Forks, Minnesota, from a public phone in Ellendale, North Dakota. The employer testified that defendant was supposed to have shown up at 3 p. m. but had called to say he would be late because he had car trouble, i. e., dirt in the carburetor. Defendant told law enforcement investigators that he had left Aberdeen between 11 a. m. and 1 p. m. enroute to East Grand Forks and had arrived at about 8 p. m. that evening. In reply to an inquiry as to the reason that he took over three and one-half hours to travel as far as Ellendale, which is only 39 miles from Aberdeen, defendant stated that he had to drive slowly because he was having trouble with his wheel bearings and motor mount. This contradicts with the statement made to his prospective employer over the telephone and with the fact that the wheel bearings had just been repaired earlier that day in Aberdeen.

On the 23rd of October, Mrs. Tschirley's body was found in a shelter belt in North Dakota. She had been stabbed twice in the back with a knife from her own kitchen. The knife was embedded in her back and the handle had been broken off. Her skull was severely fractured and the scalp on top of the head was missing. At the scene, investigators found an empty Marlboro cigarette package, blood-stained green floral tissue paper, a hammer strut and a piece of

1. State law requires a 48-hour waiting period between the purchase of a firearm and the delivery of the firearm to the purchaser.

brown plastic showing the letters "RG" from the gun grip of a Model 66 RG .22 caliber pistol, and six rounds of .22 caliber ammunition of the CCI brand.

On October 24, 1976, an affidavit was executed which requested a search warrant for a 1966 maroon Chrysler with Colorado license plates located at the residence of the defendant's parents in Aberdeen. Upon a showing of probable cause, the search warrant was issued to search the automobile. Among other items, the search resulted in the seizure of a broken piece of plastic appearing to be the piece of a butt of a pistol with the letters "RG" on it and a front seat cover. These items were subsequently admitted into evidence at the trial.

On November 4, 1976, an affidavit was executed requesting a search warrant for an additional search of the 1966 maroon automobile. A search warrant was issued upon a showing of probable cause, and execution of the warrant resulted in the seizure of another brown piece of plastic material from a gun grip and a piece of a Marlboro cigarette carton. Also on November 4, 1976, an affidavit was submitted requesting a search warrant for the residence of defendant's parents. Upon a showing of probable cause, the warrant was issued and execution of the warrant resulted in the seizure of CCI brand ammunition—.22 caliber cartridges.

At the trial, an individual from the company that manufactured the pistol defendant had purchased on the 7th of October testified that the two pieces of brown plastic with the letters "RG" on each, which were found at the scene of the body and in the defendant's automobile, were from the right and left sides, respectively, of the plastic grip of a Model 66 RG .22 caliber pistol. He further testified that the hammer strut found at the scene of the discovery of the body was definitely from a Model 66 RG .22 caliber pistol manufactured by his company.

An FBI laboratory expert testified that he had scientifically examined fibers taken from defendant's car seat cover and Mrs. Tschirley's body; that he had found numerous red nylon fibers and a significant amount of red rayon fibers on her clothing; and that these fibers were consistent with the car seat cover fibers. The FBI expert testified that while he could not positively say that the fibers on her clothing were from the car seat cover, he could definitely say that it was unlikely that the fibers came from anywhere else.

A law enforcement investigator further testified that upon a search of defendant's automobile he discovered that the passenger side of the automobile, including the seat, door panel, and dashboard, had been wiped completely clean, apparently with a damp rag, but that the driver's side had still been dusty and dirty. When the defendant was questioned about this, he stated that the right side of the car had become dirty as it was sitting in front of the motel in East Grand Forks while he was working there. When officials questioned defendant as to the whereabouts of the Model 66 RG .22 caliber pistol he had purchased on the 7th of October, defendant indicated that the pistol had been stolen out of his room at the motel in East Grand Forks. No thefts or burglaries, however, were ever reported to the police or the motel owners.

Other pertinent testimony will be discussed under our treatment of the issues raised by defendant.

Defendant presents ten basic issues in his assignments of error. The first such issue is whether the affidavits of October 24, 1976, and November 4, 1976, were sufficiently particular regarding the items sought and whether they were such that a reasonable man would conclude that those items were connected with criminal activity and would probably be found in the place to be searched.

In this regard, Article 4 of the Bill of Rights in the United States Constitution (federal article) states that

"[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated; and no warrants shall issue but upon probable cause,

supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The South Dakota Constitution Bill of Rights, Article VI, Section 11 (state article) guarantees that

"[t]he right of people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause supported by affidavit, particularly describing the place to be searched and the person or thing to be seized."

Defendant argues that these constitutional directives necessitate that the affidavit and the search warrant derived from the affidavit both contain the same particularity and specificity in the description of the items to be sought and a description of the place to be searched. Defendant reasons that if the item is not specifically and particularly set forth in the affidavit there can be no basis for probable cause for the inclusion of such an item in the search warrant and there can be no basis for probable cause for the search for and subsequent seizure of the item. For this argument, defendant relies heavily upon South Dakota case authority which states that the federal article is applicable to this jurisdiction through the Due Process Clause of the Fourteenth Amendment and, along with the state article, requires that the affidavit upon which a search warrant is issued must particularly describe the place to be searched and the person or thing to be seized. See, *State v. Watkins*, 1975, S.D., 237 N.W.2d 14; *State v. Van Beek*, 1974, 88 S.D. 154, 216 N.W.2d 561; *State v. Nelson*, 1969, 84 S.D. 218, 169 N.W.2d 533.

These cited South Dakota cases, however, did not address the precise question of whether "particularly" modifies the word "warrant" or the word "affidavit" (or oath or affirmation). We now address that question.

In *Watkins*, supra, the court held that where a police officer did not know the contents of a search warrant or items described in it and he searched for controlled substances which were not mentioned in the warrant he was making a general exploratory search under the United States and South Dakota Constitutions. The police officer simply went beyond the scope of the warrant. No affidavit was ever mentioned.

In *Van Beek*, supra, the court upheld the seizure of items not described in the search warrant because the officers could reasonably conclude on their own that the items seized had probably been used in committing the crime. This involved the scope of the warrant and no affidavit was ever mentioned.

In *Nelson*, supra, the court held that the search warrant authorizing police officers to seize any evidence in connection with the violation of the statute in question "or otherwise" did not describe the property to be seized with sufficient particularity and the items seized thereby were not admissible into evidence. Again, this involved the scope of the warrant, and no affidavit was discussed. In fact, the affidavit was not even a part of the record.

In determining the modifying effect of the word "particularly," we view the state article as being substantially the same as the federal article. In fact, the state article is "merely a restatement" of the federal article. *McDowell v. United States*, 1967, 8 Cir., 383 F.2d 599, 602–603. Accordingly, we turn to the case of *Lowrey v. United States*, 1947, 8 Cir., 161 F.2d 30, which addresses the precise question under present consideration. The *Lowrey* case involved the seizure pursuant to search warrants of distilled spirits that failed to display federal tax stamps in violation of the federal internal revenue code. The appellant argued that the affidavit executed by the government agent was insufficient in that it failed to specifically or directly state what was to be searched and seized. As the defendant argues here, the *Lowrey* appellant argued that the Fourth Amendment expressly requires that the affidavit must set out a particular or special description of the property to be seized. After a review of the federal article's subject matter, punctua-

tion, and context, the *Lowrey* court found that the phrase beginning with the word "particularly" was a prescription for the search warrant rather than the affidavit. It further found that the only prescription therein for the affidavit was the probable cause phrase. We agree with this determination.

We further find the reasoning in *United States v. Wroblewski*, 1939, 7 Cir., 105 F.2d 444, to be sound and compelling. The *Wroblewski* appellant contended, exactly as defendant contends, that the affidavit did not particularly describe the things to be seized, and therefore the search was violative of the Fourth Amendment to the United States Constitution. As in the present case, there was no contention that the search warrant did not particularly describe the things to be seized. The *Wroblewski* court found that

" '[p]robable cause,' as used in the Fourth Amendment, fixes a legal standard and does not relate to verbal expression. It connotes a legal conclusion to be drawn from a statement of, or the existence of, facts. A showing of the existence of probable cause is an unqualified condition precedent to the issuance of a warrant to search and seize, but the warrant itself constitutes the lawful authority for the search and seizure. * * * But as a further requirement for the issuance of a lawful warrant the warrant must particularly describe the premises and the 'things to be seized.'

"As a practical matter the statement of facts, which discloses 'probable cause,' necessarily will describe, or designate, to some extent the premises to be searched and the things to be seized. But this is material only as an element of the showing of probable cause. In a case such as the instant one it would be difficult to imagine a showing of probable cause for the issuance of a warrant without a designation and description of the premises and some indication of the things to be seized, and that undoubtedly would be true generally. The scope of the showing of probable cause limits the scope of the search and seizure, but in any event par-

ticularity of description is not required as a separate particular in the statement of facts relied upon to show probable cause. Particularity of description in the warrant is necessary in order to identify the place to be searched and the things to be seized. It both defines and limits the scope of the search and seizure and by its particularity of description protects individuals from unreasonable search and seizure. The requirement of particularity of description in the warrant outlaws the vicious practice of using warrants for general search and seizure." 105 F.2d at 446–447.

See *United States v. Townsend*, 1975, D.C. Mich., 394 F.Supp. 736; *United States v. Collins*, 1976, D.C.N.D., 407 F.Supp. 1096.

■ Based upon our review of the federal and state articles and the discussions in the federal cases cited and quoted above, we conclude that search warrants must particularly describe the place to be searched and the person or thing to be seized and affidavits supporting those search warrants need not particularly describe the place, person, or thing but must contain a showing of probable cause for the issuance of the search warrant. To the extent that statements in *Watkins, Van Beek*, and *Nelson*, supra, conflict with this conclusion, those statements are disapproved.

■ To determine whether there was probable cause for the issuance of the search warrants on October 24, 1976, and November 4, 1976, we must look to the respective affidavits. In reviewing the affidavits, we should not invalidate the search warrants by interpreting the affidavits in a hypertechnical manner; rather, we should read each affidavit as a whole and interpret each in a common-sense and realistic manner. *State v. Gerber*, 1976, S.D., 241 N.W.2d 720; *State v. Haron*, 1974, 88 S.D. 397, 220 N.W.2d 829; *United States v. Ventresca*, 1965, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684. Oftentimes it is hard to determine when an affidavit demonstrates the existence of probable cause, and the resolution of these marginal cases should be largely

determined by the preference to be accorded to warrants. *State v. Kietzke*, 1971, 85 S.D. 502, 186 N.W.2d 551. Accordingly, every reasonable inference possible should be drawn in order to support the determination of probable cause by the magistrate. *State v. Glidden*, 1976, S.D., 246 N.W.2d 779. See also, *Spinelli v. United States*, 1969, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637. There need not be a prima facie showing of legal evidence of a suspected act. The standard of probable cause for the issuance of a search warrant is a showing of probability of criminal activity. *Gerber* and *Haron*, supra. In addition to the reasonable ground to believe that some violation of the law exists, probable cause for a search warrant necessarily implies that there is a violation in respect to some property located on some premises, or on some person, which can be identified expressly or by reasonable inference from the information given in the affidavit so as to be capable of being particularly described in the warrant. See, *State v. Hermandson*, 1969, 84 S.D. 208, 169 N.W.2d 255.

With these standards in mind, we turn to a review of the findings of fact and conclusions of law entered by the trial court regarding the October 24, 1976 affidavit.[2] The trial court made the following pertinent findings from the facts and reasonable inferences therefrom on the face of the affidavit: that the magistrate relied exclusively on the affidavit ·to determine the existence of probable cause; that Mrs. Tschirley left her home in an automobile, other than her own, under circumstances that were unusual in that her departure appeared to be rather sudden and involuntary; that a maroon vehicle was seen in her driveway and said vehicle may have had some connection with her disappearance and death; that defendant owned a 1966 maroon Chrysler; that Mrs. Tschirley was found dead and was probably brutally murdered; that defendant had borrowed money from Mrs. Tschirley and had threatened her two years prior to her death; that defendant was capable of threatening harm to persons in that he had threatened the life of a North Dakota minister and his family; that defendant traveled on a route through North Dakota near the location where the body was found; that defendant's inconsistent statements to police investigators may have been an attempt to preclude discovery of his abduction of Mrs. Tschirley; that Mrs. Tschirley may have left with defendant in his car from her home in Roscoe; that Mrs. Tschirley was killed by a knife and possibly some other weapon or instrument capable of causing severe blows to her head and the knife and other weapon or instrument may be found in defendant's car; that fingerprints, blood, and hair of Mrs. Tschirley, as well as fibers of her clothing and her wristwatch, may be found in defendant's car; and that the exact location of defendant's car was specified. From these facts and reasonable inferences gleaned from the face of the affidavit in question, the trial court found that probable cause was stated for issuance of the search warrant dated October 24, 1976. We agree. The probability of criminal activity was demonstrated, defendant was linked to such activity, and the items sought by the warrant[3] were identified by reasonable inferences from the information given in the affidavit.[4]

Subsequent to the October 24th search of defendant's automobile, an affidavit was executed for the issuance of a search warrant for defendant's home. The trial court made the following findings from the facts and reasonable inferences therefrom on the face of this affidavit dated November 4th: that Mrs. Tschirley, who was missing from

2. With the exception of the caption, the affidavit dated October 24, 1976, is reproduced in the appendix following the opinion.

3. The search warrant dated October 24, 1976, gave the exact location of defendant's automobile and commanded a search for the following property: "A broken knife handle and other weapons; blood, hair, fibers and fingerprints; paper towel or napkins with green floral design; a wrist watch or clothing items of the deceased, Mary Tschirley."

4. With the exception of the paper towel or napkins with green floral design.

her home, was found stabbed with a knife missing a handle and beaten on the head with an unknown blunt instrument; that at the time of her disappearance, she possessed a red quilted car coat, a wristwatch and key ring; that defendant purchased a Model 66 revolver manufactured by R.G. Industries prior to Mrs. Tschirley's disappearance; that a piece of plastic gun grip with the initials "R.G." and .22 caliber shells manufactured by the CCI Corporation were found near the body; that a piece of plastic gun grip with the initials "R.G." stamped on it was found in defendant's automobile pursuant to the October 24th search; that Mrs. Tschirley's clothing examined by the FBI contained red nylon fibers similar to the red nylon material in defendant's car seat; that the FBI stated that the plastic gun grip found in defendant's car was from an R.G. Industries revolver Model R.G. 63 or 66; that defendant knew Mrs. Tschirley; that a maroon car similar to defendant's was seen at her house; and that defendant was traveling near the scene where the body was located. The trial court found that the affidavit made a showing of probable cause for issuance of a warrant on November 4th for a search of the residence of defendant. We agree. The probability of criminal activity was demonstrated, defendant was linked to such activity, and the items sought by the warrant [5] were identified by reasonable inferences from the information given in the affidavit.

The affidavit also dated November 4, 1976, seeking issuance of a warrant to search defendant's automobile for a second time, incorporated the October 24th affidavit by reference and included many of the additional facts found in the affidavit to search defendant's residence. This affidavit for a second search of defendant's automobile stated that the first search was minimal and cursory in nature and that addi-

tional evidence in the case justified a much more extensive and critical search of the automobile. Such evidence showed that defendant, his revolver, his automobile, and the scene of the body were probably linked together in some type of criminal activity. Based upon this showing of probable cause, the trial court found that the warrant for a second search of the automobile [6] was properly issued. We agree.

The second basic issue presented by defendant is whether the November 4, 1976 affidavits, search warrants and items seized pursuant to execution thereon were inadmissible as being derivative of the unlawful search and seizure of October 24, 1976. Due to the fact that the October 24th affidavit showed probable cause for issuance of the search warrant, there was a lawful search and seizure on that date; therefore, the searches and seizures on November 4, 1976, were lawful derivatives of the October 24th search and seizure.

■ The third issue presented by defendant is whether Edmunds County, South Dakota, had jurisdiction to charge defendant with the crime of kidnapping. Kidnapping is defined in SDCL 22–19–1 as seizing, confining, inveigling, decoying, kidnapping, abducting or carrying away any person and holding or detaining such person for ransom, reward, or otherwise. SDCL 23–9–26 provides that the jurisdiction for the crime of kidnapping shall be in any county in which the offense is committed, "or into or out of which the person upon whom the offense is committed may, in the commission of the offense, have been brought, or in which an act was done by the defendant, in instigating, procuring, promoting, aiding or in being an accessory to the commission of the offense * * *." The facts show that Mrs. Tschirley was a life-long resident of

---

5. The search warrant dated November 4, 1976, gave the exact location of defendant's residence and commanded a search for the following items: "knife handle, revolver (R.G. Industries, Serial # C290–365), personal articles belonging to Mrs. Mary Tschirley (red coat, wristwatch, keyring), and .22 caliber ammunition, CCI brand."

6. The search warrant dated November 4, 1976, described the defendant's automobile, its exact location and commanded a search for "further evidence of the victim's presence in said vehicle and evidence of weapons belonging to Steven Kaseman * * *."

Edmunds County and that after October 6, 1976, she disappeared from Edmunds County. The facts further show that she did not voluntarily leave her house and that her beaten and stabbed body was found some 100 miles away in North Dakota. As discussed above, defendant was sufficiently linked to the disappearance to be charged with the crime of kidnapping, i. e., "carrying away" Mrs. Tschirley from Edmunds County. We find that Edmunds County had jurisdiction to charge defendant with kidnapping.

 The fourth issue presented by defendant is whether the trial court erred in denying his motion for a psychiatric examination of Michael Sanders and in allowing Sanders' testimony. Granting a motion or request for psychiatric examination is a matter within the discretion of the trial judge. *State v. Parker*, 1978, S.D., 263 N.W.2d 679. In support of the motion for a psychiatric examination, defendant's attorneys executed an affidavit stating that Sanders was an alcoholic and drug user, that he had a prior felony criminal record, and that from their investigations he suffered from severe psychological abnormalities. Defendant's attorneys were not qualified to give an opinion with regard to alleged psychological abnormalities; that conclusion certainly does not follow from the fact that one uses drugs or alcohol and has a criminal record. The affidavit did not constitute a substantial showing of need and justification for the examination. *State v. Parker*, supra. We find that the motion was properly denied by the trial judge.

 Regarding Sanders' testimony, Sanders was a friend of defendant and testified as to conversations he had with defendant beginning two years prior to Mrs. Tschirley's death. In September of 1974, defendant discussed a plan he had to "rip off" Mrs. Tschirley for an amount of money by getting her address book and threatening to harm persons found in it if she did not pay them money. They discussed this scheme again in March of 1976, and when Sanders purportedly expressed concern at

being recognized and getting caught, defendant said that the only way to avoid that was to "bump her off." In August of 1976, they again discussed "ripping off" Mrs. Tschirley for nine or ten thousand dollars. On this occasion, they traveled to Roscoe and attempted to gain entrance to her home but failed in their attempt. Also in August, they discussed a further scheme to get money from Mrs. Tschirley. The scheme involved dressing up in suits, acting real religious, and asking for a contribution to a certain faith. On August 13, 1976, defendant supposedly told a third party in Lemmon, South Dakota, that they knew a woman in Roscoe who had money and that he would like to rip her off and do away with her so there would not be any witnesses. Driving back through Roscoe from Lemmon, defendant asked Sanders, "should we do it?" When Sanders said he did not want to do it, defendant stated that Sanders would probably regret it or be sorry he did not come along with defendant on the "Mrs. Tschirley deal" and that Sanders should not be surprised if he heard something about it. On cross-examination, defense counsel went into Sanders' background and credibility. Sanders' ex-wife corroborated his testimony regarding a scheme of getting money by going to Roscoe, ripping Mrs. Tschirley off, and then bumping her off. All of this testimony was properly allowed into evidence by the trial court and it was for the jury to determine the credibility to be given to Sanders and the weight to be given to his testimony.

 The fifth issue presented by defendant is whether the trial court erred in denying his motion for inspection of grand jury minutes of the particulars of what evidence was presented to it. The minutes of the grand jury proceedings were not transcribed; therefore, there could be no inspection of minutes as requested. The fact that grand jury testimony was not recorded is of no particular legal consequence because there is no constitutional or statutory requirement that it be recorded. *State v. Bad Heart Bull*, 1977, S.D., 257 N.W.2d 715. With regard to the particulars

of the evidence presented to the grand jury, disclosure may be proper where the ends of justice require it and where the defense meets its burden of showing that a particularized need outweighing the policy favoring grand jury secrecy exists for such evidence. *State v. Bad Heart Bull*, supra; SDCL 23–30–13 and 23–30–14. Interviews with the members of the grand jury would have been improper and contrary to the policy of secrecy. Defendant was furnished with the names of all the witnesses who testified before the grand jury.[7] The record reveals that defendant was allowed extensive discovery of the state's case and there was no compelling reason for seeking particulars of the evidence before the grand jury. We find that "the ends of justice" do not require any such disclosure here in that defendant has failed to meet the burden of showing a particularized need for such evidence presented to the grand jury. Accordingly, the trial judge properly denied the motion for particulars of evidence before the grand jury.

 The sixth issue presented by defendant is whether the trial court erred in admitting three photographs of the deceased as she was found at the scene and in allowing the pathologist's testimony. Defendant contends that the photographs of Mrs. Tschirley's body were submitted only to arouse the passions of the jury and to cloud the real issue of whether the elements of the crime of kidnapping were present. The state points out that the indictment includes in the charge of kidnapping the fact that Mrs. Tschirley "was not liberated unharmed, and in fact was killed." The photographs presumably show her identity and the fact that she was not released unharmed. This demonstrated the fact that Mrs. Tschirley was carried away and held for a purpose *other than* ransom or reward, i. e., murder. The photographs were also relevant to explain the presence of the hammer strut and pieces of the gun grip at the scene where the body was found because the pathologist testified that the

severely fractured skull was consistent with being struck by an R.G. Model 66 revolver similar to the one purchased by defendant. We have stated that photographs are admissible into evidence "when they accurately portray anything which it is competent for a witness to describe in his own words, or where they are helpful as an aid to a verbal description of objects or conditions and relevant to some material issue." *State v. Zobel*, 1965, 81 S.D. 260, 279, 134 N.W.2d 101, 111. See, *State v. Satter*, 1976, S.D., 242 N.W.2d 149, 152. Photographs are not inadmissible simply due to the fact that the details of the crime are vividly brought to the jury's attention or because they "incidentally tend to arouse passion or prejudice." *State v. Zobel*, supra. See, *State v. Hamm*, 1975, S.D., 234 N.W.2d 60, 66. Like any other demonstrative evidence, the admission of photographs lies within the sound discretion of the trial court. *State v. Disbrow*, 1978, S.D., 266 N.W.2d 246; *State v. Miller*, 1976, S.D., 248 N.W.2d 56; *State v. Hoover*, 1975, S.D., 236 N.W.2d 635; *State v. Hamm*, supra. We find that the photographs and the testimony of the pathologist were of probative value and that the trial court did not abuse its discretion in allowing such photographs and testimony into evidence.

 The seventh issue presented is whether the trial court erred in admitting defendant's admission against interest obtained while he was in custody and without aid of counsel. The incident in question took place in the Edmunds County jail during a conversation between defendant and the sheriff. The sheriff was taking an attitude check of the prisoner as was his normal practice; he asked about defendant's health, the jail food, jail conditions, etc. Defendant inquired whether there were any results on the FBI testing of a blanket taken from the front seat of his automobile. Defendant was told that before the sheriff could discuss the case with him he must be advised of his *Miranda*[8] rights again. The

---

7. The names were endorsed at the foot of the indictment as required by SDCL 23–31–5.

8. *Miranda v. Arizona*, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

sheriff proceeded to advise defendant of all of his rights. Defendant was asked if he understood the rights given him, and he replied affirmatively. Defendant was also asked if he was willing to talk to the sheriff with those rights in mind, and he again replied yes. At that point, the sheriff indicated that the results were not back from the FBI. The sheriff continued the conversation by discussing a case defendant was involved in as a juvenile as follows:

"I said, Steve, with that case that you were involved in with the burglary at Craven Corner and he corrected me and said, I didn't do that, he said, Mike Sanders did that. And I said, well, I don't know which of you did it, but at the same time why the young people have a lot of problems as they grow up and I've watched a lot of them grow up and go through the bad times and I expected you to take and make it and straighten out and be a decent young man also. And I never would have guessed that you would—you would do something like this."

Defendant's response to this statement was "Yes; you guessed wrong." Defendant contends that this answer was confusing as to whether it applied to the burglary or the kidnapping and that it was not freely and voluntarily made. The jury could consider the statement's confusing nature in light of the context in which it was stated and in view of the questions about it which were raised by defendant's counsel on cross-examination. Defendant clearly was given his rights, understood them, and agreed to waive them and discuss the case with the sheriff; this voluntary consent constituted a knowing and intelligent waiver of his rights. *State v. Pieschke*, 1978, S.D., 262 N.W.2d 40; *State v. Adkins*, 1975, 88 S.D. 571, 225 N.W.2d 598. Therefore, the trial court did not commit error in allowing defendant's admission against interest.

The eighth issue presented by defendant is whether the trial court erred in allowing the testimony of David Bachman. Bachman testified about two different conversations with defendant regarding the criminal charges pending against him while they were together in the Brown County jail prior to trial. The first conversation took place in mid-February of 1977, and involved a situation in which they were feeling sorry for themselves. Bachman discussed his at-tempted robbery of a liquor store and stated that if he had not done what he had, he would not be there (in jail), and in reply, defendant allegedly said, "If I wouldn't have done what I did, I wouldn't be here either." The second conversation took place a week or so later and involved discussions between the prisoners about their various cases, and defendant purportedly stated that "they saw my car leave that area where it happened." The contention is that this testimony was not proper rebuttal testimony and that its prejudicial nature outweighs its probative value.

■ It is true that the defendant did not testify, and thus the testimony of Bachman could not be in direct rebuttal to defendant's testimony. If defendant had also rested his case at the conclusion of the state's case, the contention of the defendant would be well taken. In that case there would be no testimony to rebut. However, the defendant did plead not guilty to the charges against him and attempted to establish an alibi through other witnesses that he was not in the area at the critical period and thus could not have been guilty of the kidnapping. Bachman's testimony of defendant's statements that "they saw my car leave that area where it happened" and "If I wouldn't have done what I did, I wouldn't be here either" would rebut the evidence of defendant's witnesses that he was not in the area and could not have committed the crime. Rebuttal testimony is not limited to rebutting the testimony of the defendant. Rebuttal testimony is not limited to rebutting the testimony of the defendant.

While this evidence would have been appropriate in the state's case in chief, it is relevant rebuttal testimony to the defendant's witnesses, and there is nothing in the record to indicate that the state was "laying in the weeds" with the testimony. Counsel for the state advised the trial court and defense counsel that the witness and the substance of his testimony only became known to them over the weekend and after the state had rested. There is certainly nothing in the record to rebut this statement or to make one doubt its accuracy. We find that the probative value of Bach-

man's rebuttal testimony outweighed its prejudicial effect. The jury viewed the witness and could weigh his testimony in light of his credibility, which was called into question quite vigorously upon cross-examination [9] and upon closing argument.

 The ninth issue on appeal involves the trial court's denial of two motions for mistrial. The first motion for mistrial involved a comment made by counsel for the state during the cross-examination of a witness for the state. Counsel for defendant was inquiring about a collect phone call from defendant to his prospective employer. He began a line of questioning regarding whether defendant reported for work every day. At that point, counsel for the state asked, "Your Honor, are we going into character testimony?" Opposing counsel replied that he was not doing so and proceeded with his questioning. Defendant contends that this question implied that he had something to hide about his character and that such implication was highly prejudicial before the jury. We disagree. There was no objection at the time the question was asked. The witness answered the previous question that defendant did indeed report for work every day and further that he reported on time. This inference of good character could hardly be prejudicial to defendant. Therefore, the trial court properly denied the first motion for mistrial. The second motion for mistrial resulted from a newspaper article published after the jury was selected in which it was erroneously reported that counsel for the state said defendant entered a plea of guilty after the indictment was made. It was established at a hearing on the motion that this was a total misquote by the newspaper. The trial judge admonished the members of the jury by reminding them that they were to decide the case only on the facts presented in the courtroom, by informing them that a newspaper article

carried an erroneous statement about the not guilty plea being a guilty plea, by refreshing their memories as to the exact plea entered in the courtroom, and by requesting that they refrain from reading newspapers and watching television accounts of the trial. The trial judge further admonished the jury throughout the trial. Defendant was not unfairly prejudiced by this incident and the trial judge properly denied the second motion for mistrial.

 The tenth issue presented by defendant is whether the trial court erred in denying motions for directed verdict, for judgment of acquittal notwithstanding the verdict, and for a new trial. The first two contentions regarding error in denying motions for directed verdict and for judgment of acquittal notwithstanding the verdict present us with a challenge to the sufficiency of the evidence to justify the verdict. *State v. Bonrud*, 1976, S.D., 246 N.W.2d 790; *State v. Nelson*, 1964, 80 S.D. 574, 129 N.W.2d 54. We have expressed the appellate rules of review in this regard in *State v. Dietz*, 1978, S.D., 264 N.W.2d 509, as follows:

"In determining the sufficiency of evidence on appeal, the question presented is whether or not there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilty beyond a reasonable doubt. *State v. Shank*, 1975, S.D., 226 N.W.2d 384, 387. In making that determination, 'this court will accept "that evidence, and the most favorable inferences that can be fairly drawn therefrom, which will support the verdict."' *State v. Best*, 1975, S.D., 232 N.W.2d 447, 457. [See also, *State v. Boyles*, 1977, S.D., 260 N.W.2d 642.] Although the rule at the trial level requires that the jury find the circumstantial evidence be conclusively inconsistent with any reasonable hypothesis of innocence, *State v. Best*, supra, the rule at the appel-

---

**9.** Bachman was a convicted felon serving two years in the state penitentiary for second-degree armed robbery. Defense counsel even took Bachman through the robbery steps for the jury. There was an inference that Bachman had traded his testimony for an early parole. It was also pointed out that since defendant and Bachman were in jail together for some 53 days it was indeed suspicious that defendant only made these two statements in that long period of time.

late level is that a guilty verdict will not be set aside if the evidence, including the circumstantial evidence and reasonable inferences, sustains a rational theory of guilt. *State v. Luna,* 1978, S.D., 264 N.W.2d 485." (264 N.W.2d at 510–511)

Applying the principles stated above, our review of the record reveals that the evidence sustains a rational theory of guilt from which the jury could find defendant guilty beyond a reasonable doubt of the kidnapping of Mrs. Tschirley.

Defendant's motion for a new trial is based upon new evidence discovered after trial regarding alleged perjury in the testimony of David Bachman. This new evidence was in the form of affidavits from two other prisoners in the Brown County jail at the time defendant purportedly made the statement that if he had not done what he did, he would not be in jail either. The affidavits indicated that defendant made no such statement during the particular conversation in question. The trial court may grant a new trial after a verdict is rendered against the defendant "[w]hen new evidence is discovered material to the defendant, and which he could not with reasonable diligence have discovered and produced at the trial." SDCL 23–50–2(8). There must also be a showing that "substantial rights have been prejudiced." SDCL 23–50–2. There has been a showing of all of the elements with the exception of the prejudice of substantial rights. The new evidence contained in the affidavits impeaches and discredits part of Bachman's testimony. Bachman's testimony had already been impeached by an intensive cross-examination which brought out the fact that he was a convicted felon trying to trade his testimony for early parole. It was within the trial court's discretion to decide whether the failure to produce the "new" evidence at trial was prejudicial to defendant. A new trial is not granted for newly discovered evidence which merely impeaches or discredits a witness at the trial. *State v. Gerdes,* 1977, S.D., 258 N.W.2d 839; *State v. Martinez,* 1974, 88 S.D. 369, 220 N.W.2d 530; *State v. Furlow,* 1973, 87 S.D. 634, 213 N.W.2d 705; *State v. Dowling,* 1973, 87 S.D.

532, 211 N.W.2d 572; *State v. Larkin,* 1972, 87 S.D. 61, 202 N.W.2d 862. We find no abuse of discretion in the trial court's denial of a new trial under these circumstances.

The judgment is affirmed.

WOLLMAN, C. J., and PORTER and MORGAN, JJ., concur.

ZASTROW, J., concurs in result.

### APPENDIX

"We, Jerry Lindberg, Agent for the South Dakota Division of Criminal Investigation, and Kay D. Clark, Sheriff of Edmunds County, South Dakota, being first duly sworn, on oath, depose and say:

"That Ralph Preszler of Roscoe, South Dakota reported to the Edmunds County Sheriff's office on October 12th, 1976 that his friend, Mary Tschirley, age 78, was missing from her home at Roscoe. The house was unlocked, the lights were on in the kitchen, food on top of the stove and in the oven was burnt up and the stove was still on.

"That Ms. Tschirley's car was in the garage and nothing appeared to be missing from the house.

"Investigation revealed she was last seen on October 6, 1976, at a local resturant (sic) in Roscoe at about 5:30 p. m.

"Ralph Preszler had a phone conversation with Ms. Tschirley approximately 7:30 p. m. on October 6, 1976.

"Since that time no one has seen or heard from her.

"At approximately 9:30 a. m. on October 23, 1976, a group of hunters located Ms. Tschirley's body in a shelter belt SE of Ellendale, North Dakota approximately 5 miles south of Guelph, North Dakota in the SW ¼ of Section 31, Range 60, Port Emma Township 129.

"Preliminary examination revealed a broken knife blade protruding from the victim's back and she had been beaten about the head and her skull was fractured. The body was frozen solid and she had been dead for several days.

"Ralph Preszler, age 45 of Roscoe, who is a reliable citizen, well-regarded in the community and life-long resident of Edmunds County, advised Sheriff Clark that Mary Tschirley told him Steven Kaseman tried to borrow a large amount of money from her about 2 years ago. At the time she related to Preszler she gave him $50.00. Preszler got the impression that Steven Kaseman had threatened Mary with bodily harm. Kaseman's sister later called Mary and apologized for Steven's behavior and stated she would repay the $50.00. Mary related to Preszler that Kaseman told her he owed a gambling debt and that the Mafia was after him. Preszler doesn't know if the debt was repaid or not.

"Ralph Preszler and Henry Sporer, Mary Tschirley's son, advised Sheriff Clark that Steven A. Kaseman had done yard work for Ms. Tschirley and had been to her home many times. Kaseman aslo (sic) lived in Roscoe at one time.

"Around 2:00 p. m. on the afternoon of October 7, 1976, three different individuals saw a maroon car parked in Mary Tschirley's driveway. Ralph Preszler related to Sheriff Clark he thought it was a dull maroon color and about a 1966 Chrysler.

"City Police officer Randy Lechner of Roscoe also observed a maroon vehicle in Mary's yard and he thought it was a 1966 or 1967 model vehicle.

"Mrs. Ida Langford who is approximately 70 years old and a life-long resident of Roscoe, also a nextdoor neighbor of Mary Tschirley for a number of years, also saw a maroon vehicle in Mary's driveway on October 7, 1976. Mrs. Ida Langford also observed a maroon vehicle pull away from Mary Tschirley's house on the afternoon of October 7, 1976 and go south on Roscoe's main street. She observed two individuals in the car, one large and one smaller.

"Steven Kaseman is 24 years old and is approximately six feet tall and weighs over 200 pounds. Mary Tschirley was 78 years old, 5'5" tall and weighed about 160 pounds.

"Steven A. Kaseman owns a 1966 Maroon Chrysler car bearing Colorado license BJ 5310.

"On October 23, 1976 Sheriff Milton Wiest of Wishek, North Dakota advised that Steven Kaseman had been arrested in McIntosh County, North Dakota on December 23, 1974. He was arrested after a high speed chase fleeing the scene of a kidnap and extortion case in Wishek. Kaseman had threatened a local minister's life and also threatened to do harm to his wife and children if the minister didn't give him money. The minister went to the bank with Kaseman and withdrew approximately $750.00 and gave it to Kaseman. Kaseman then bound the minister and gagged him and left him locked in the restroom of his church. The minister was able to free himself and call authorities who were able to apprehend Kaseman.

"Kaseman, after a plea bargin (sic) through his attorney, pled guilty to aggravated assault and battery in McIntosh County. He received a deferred imposition of sentence with certain restrictions from the Court which involved a voluntary psychiatric evaluation. These restrictions were successfully carried out by Kaseman.

"Sheriff Clark contacted Steven Kaseman's mother in Aberdeen as to his whereabouts. She advised Sheriff Clark that Steven had left home in Aberdeen at about 10:00 a. m. on the morning of October 7, 1976 to travel to Grand Forks, North Dakota for a job driving truck.

"On October 18, 1976, Steven Kaseman was located and interviewed by Sheriff Clark and Special Agent Tom Fahey in East Grand Forks, Minnesota. During the interview Kaseman first stated that he left Aberdeen at 11:00 a. m. on the 7th of October and then later stated it was around 1:00 p. m. on the 7th.

"Kaseman stated that a motor mount was broken and a wheel bearing was out and he had to drive very slowly. He stated he stopped at Ellendale, North Dakota and called his employer collect to advise him he was having car trouble and he would be late. He stated he arrived in East Grand Forks at approximately 8:00 p. m. on October 7, 1976. He was driving a maroon 1966 Chrysler with Colorado license BJ 5310.

"He denied being to Roscoe, South Dakota on October 7, 1976 and stated he hadn't seen Mary Tschirely (sic) for at least two years.

"Contact with Kermit Christianson who employed Kaseman at East Grand Forks was made by North Dakota law enforcement officers on the evening of October 23, 1976 and Mr. Christianson was also interviewed by telephone by Special Agent Tom Fahey and Jerry Lindberg.

"Kermit Christianson advised he had contacted Steven Kaseman on October 1, 1976 by telephone and hired him to drive a truck for him. Kaseman was to report for work at East Grand Froks (sic) at 3:00 p. m. on October 7, 1976. Kermit Christianson advised that Kaseman had called him around 5:00 p. m. on October 7, 1976 and said he was at Valley City, North Dakota and that he was having car trouble and that he would be late in arriving. Christianson didn't know if it was a collect call or not and the earliest opportunity to check this information will be at 8:00 a. m. on October 25, 1976. Christianson further advised that Kaseman called him again on October 7, 1976 at about 9:30 p. m. from the Holiday gas station in East Grand Forks. Christianson then met Kaseman and directed him to the Eastview Motel at East Grand Forks. Kaseman was picked up at the motel the following morning and furnished a truck to drive by Christianson. He worked for Christianson until October 18, 1976, when the job was finished. Christianson told Kaseman he could get him a job at the sugar beet plant on the 19th of October, 1976.

"Christianson inquired of Kaseman what kind of car trouble he had enroute from Aberdeen. Kaseman told him he had carburetor trouble and he thought some dirt got through the gas filter. He claimed he had the car worked on at a gas station in Valley City, North Dakota.

"It is noted that when Sheriff Clark interviewed Kaseman on October 18, 1976 he denied stopping for repairs any place and stated he drove very slowly because of the motor mount and wheel bearing trouble with the car.

"Christianson advised Kaseman was operating a maroon Chrysler while he was in East Grand Forks. Christianson went to the Eastview Motel in East Grand Forks and met Kaseman to pay him and line him up with a new job. Kaseman stated he had talked to his parents and had decided to go back to Aberdeen. Kaseman checked out of the motel at 9:45 a. m. on October 19, 1976 and returned to Aberdeen, South Dakota where he was observed in his car by Sheriff Clark on the afternoon of October 19, 1976. Kaseman told Sheriff Clark on October 18, 1976, that he planned to stay in East Grand Forks and work.

"Sheriff Clarked (sic) checked with Aberdeen Motors on October 20, 1976 in regard to repairs made on Steven Kaseman's car. He learned that they had worked on a 1966 maroon Chrysler on October 6, 1976 and finished on the morning of October 7, 1976. They repaired a wheel bearing, and he had a broken motor mount which was not repaired. Kaseman related to Sheriff Clark he had picked up the car at 10:00 a. m. on October 7, 1976.

"Sheriff Clark went to Eddie's Northside Phillips 66 and learned that Kaseman had charged gas and oil on October 7, 1976. Kaseman had told Sheriff Clark he had work done on his car at this station on October 7, 1976 but they had only the record of gas and oil charge.

"Sheriff Clark checked the Colorado registration on Steven Kaseman's maroon 1966 Chrysler and Colorado authorities advised he was the registered owner and showed a Denver, Colorado address. Tom Fahey personally observed the Colorado license BJ 5310 on a maroon 1966 Chrysler owned by Steven Kaseman at the Eastview Motel, East Grand Forks, Minnesota and this is the registration number checked with Colorado authorities.

"Sheriff Clark talked to Steven Kaseman's mother on October 13, 1976 and she stated that the car in question was her car and that it was a 1964 model.

"To the best of our knowledge the vehicle in question is currently stored at the Wal-

vin Kaseman residence at 519 SW 15th Avenue in Aberdeen, South Dakota. Sheriff Clark and Jerry Lindberg observed this vehicle in the garage at this address at approximately 5:00 p. m. on October 22, 1976.

"WHEREFORE, your Affiants respectfully pray that the Court issue a warrant to search for the 1966 maroon Chrysler with Colorado license BJ 5310 at 519 SW 15th Avenue SW, Aberdeen, South Dakota and further request that the vehicle in question be moved to a suitable indoor area as the examinations required to locate the evidence are highly technical and scientific in nature and require a great deal of time and controlled conditions.

"Dated this 24th day of October, 1976.

"/s/ Jerry Lindberg
Jerry Lindberg, Agent DCI.

"/s/ Kay D. Clark
Kay D. Clark, Sheriff Edmunds County

"Subscribed and sworn to before me this 24th day of October, 1976.

/s/ Lola Poirier, Notary Public, South Dakota
My commission expires 12/14/80."